**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Charlotte Division
Case No. _____**

| | |
|---|---|
| XUEJUN ZHANG, | |
| Plaintiff, | |
| v. | **COMPLAINT** |
| DRAGON CAPITAL GROUP, LLC, PREMIER INVESTMENTS & FINANCIAL SERVICES GROUP, LLC, FXTRADE ZH, LP, ALEXANDER C. CHENG AND STEPHEN L. KIRKLAND, | |
| Defendants. | |

Plaintiff Xuejun "Mark" Zhang ("Zhang") complaining of Dragon Capital Group LLC ("Dragon"), Premier Investments & Financial Services Group, LLC ("Premier"), FXTrade ZH, LP ("FXTrade"), Alexander C. Cheng ("Cheng"), and Stephen L. Kirkland ("Kirkland" and together with Dragon, Premier, and Cheng, "Defendants") alleges and says that:

**PARTIES, JURISDICTION AND VENUE**

1.      Zhang is an individual, not under any disability, who is a resident of Mecklenburg County, North Carolina.

2.      Upon information and belief, Dragon is a limited liability company organized and existing under the laws of Wyoming, with its principal place of business in Charlotte, North Carolina. However, Dragon is not registered to do business in North Carolina.

3.      Upon information and belief, Premier is a limited liability company organized and existing under the laws of Puerto Rico, with its principal place of business in Puerto Rico.

1

4.     Upon information and belief, FXTrade is a limited partnership organized and existing under the laws of California, with its principal place of business in Charlotte, North Carolina. Upon information and belief, Dragon is the general partner of FXTrade.

5.     Upon information and belief, Cheng is an individual, not under any disability, who is a citizen and resident of Mecklenburg County, North Carolina. Upon information and belief, Cheng is a principal of Dragon.

6.     Upon information and belief, Kirkland is an individual, not under any disability, who is a citizen and resident of Georgia. Upon information and belief, Kirkland is a principal of Premier.

7.     This action arises under the Commodity Exchange Act (7 U.S.C. §§ 1 et seq.). This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and has supplemental jurisdiction over the state law claims alleged in this Complaint pursuant to 28 U.S.C. § 1367.

8.     This Court has personal jurisdiction over the Defendants in this action, as each Defendant either resides in this District or directed conduct into this District relating to the claims in this action.

9.     As is further set forth herein, a substantial part of the events or omissions giving rise to the claims alleged in this Complain occurred and have a direct effect in this District. Venue therefore properly lies in the United States District Court for the Western District of North Carolina pursuant to 28 U.S.C. § 1391(b)(2).

## INTRODUCTION

10.     This is an action to recover funds Zhang invested with Defendants, supposedly for foreign currency exchange transactions ("Forex"), in reliance on false and misleading representations by Cheng and Kirkland, made in concert with and on behalf of all Defendants.

2

Generally speaking, Forex trading involves speculating on the relative values of international currencies, for example, on the belief that the U.S. Dollar will rise or fall against the Euro. Among other things, Defendants represented that Zhang's investment would achieve a guaranteed, minimum monthly return, that the investment was completely safe, and that his money was accruing value in an account that would be returned on just days' notice. Despite being told that Zhang had over $1.2 million in his "account" and that it continued to grow by at least the "guaranteed" return on a monthly basis, when Zhang requested the return of some of his money, he was told that all of it was gone and had been lost several months earlier on Forex trades.

## FACTUAL BACKGROUND

**A.    Cheng and Kirkland's Pattern of Fraudulent Behavior.**

1.    Unbeknownst to Zhang at the inception of this trading relationship, both Cheng and Kirkland have been found by federal government agencies to have participated in fraudulent activity.

        i.    <u>Kirkland Is Permanently Barred by the SEC and Indicted for Similar Fraudulent Schemes</u>

2.    Kirkland's history is rife with fraudulent endeavors investing others' money. The Securities and Exchange Commission (the "SEC") instituted a lawsuit against Kirkland in the Northern District of Georgia for orchestrating a scheme to defraud investors in a securities trading program. In April 2015, the United States District Court for the Northern District of Georgia entered a permanent injunction against Kirkland, with his consent, for committing violations of Section 10(b) of the Securities Exchange Act of 1934, Exchange Act Rule 10b-5, and Sections 206(1) and (2) of the Investment Advisers Act of 1940 (the "Advisers Act"). A true and accurate

copy of the Permanent Injunction filed in the Northern District of Georgia is attached hereto as **Exhibit A**.

3.    In May 2015, the SEC instituted a separate administrative proceeding to investigate Kirkland's violations of the above-cited laws. After an initial review of the facts surrounding the investigation, the SEC issued Initial Decision Release No. 875 on September 2, 2015 (the "SEC's Initial Decision"). A true and accurate copy of the SEC's Initial Decision is attached hereto as **Exhibit B**.

4.    According to the SEC's Initial Decision, between late 2008 and late 2010, Kirkland and The Kirkland Organization ("TKO"), a for-profit Georgia Corporation, solicited investors for a program allegedly run by Westover Energy Trading Partners, LLC ("Westover"). Neither Westover nor TKO were ever registered with the SEC or any state securities agency. Kirkland told potential investors that Westover traded securities listed in the United States and all investments would be principally placed in index funds, exchange traded funds and commodities funds. Kirkland represented to investors that they should expect between 2% and 3% returns on investments per month. Kirkland also represented to investors that their investments would be indemnified by TKO for any trading losses up to $5,000 in a single day, and indemnified by Westover for any losses exceeding $5,000 on a single trading day. The SEC's Initial Decision determined these representations to be false.

5.    The SEC also found that Kirkland had furthered his fraudulent scheme by preparing and presenting false documents to investors. The false documents distributed by Kirkland included a biography of a "New York real estate developer/owner," claimed to be a principal of Westover, who "impart[ed] his knowledge and expertise and lend[ed] his financial support as well as the benefit of his numerous real estate industry and financial market connections" to Kirkland's

4

investors. The "New York real estate developer/owner" used in Kirkland's documents was not only wholly unaffiliated with Kirkland or TKO, but was only a former client of, and never a principal of, Westover.

6.      Using such false representations and fraudulent documents, Kirkland convinced ten investors in the United States and Great Britain to invest at least $800,000 by the end of 2010. When these investors demanded that Kirkland and TKO return their investments, Kirkland refused and ignored their requests.

7.      Based on the aforementioned findings of fact by the SEC, a full collateral bar was imposed by the SEC against Kirkland pursuant to Section 203(f) of the Advisers Act. In its decision, the SEC noted that Kirkland's violations were "egregious," intentional, "recurrent and were not isolated," and stated that "[i]t is self-evident that someone who is willing to lie to induce investors to invest is ill-suited to remain in the securities industry." Exhibit B, p. 6.

8.      The SEC's Initial Decision was affirmed in a Final Order, Release No. 4241, on October 23, 2015 (the "SEC Final Order"). A true and accurate copy of the SEC Final Order is attached hereto as **Exhibit C**.

9.      Despite being "permanently barred from associating with a broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization" by the SEC in 2015, Kirkland resumed an almost identical fraudulent investment scheme around Forex trading no later than 2019, when Zhang began investing.

10.     Furthermore, on March 22, 2021, Kirkland was indicted in District Court for the District of Puerto Rico for Conspiracy to Commit Wire Fraud (18 U.S.C. §§ 1349 and 1343), Wire Fraud (18 U.S.C. § 1343), and Money Laundering (18 U.S.C. §§ 1957 and 2) (the "Federal

Indictment"), in a scheme nearly identical to the one present in this case. A true and accurate copy of the Federal Indictment is attached hereto as **Exhibit D**

11.     In the Federal Indictment, the grand jury found that Kirkland and six co-defendants orchestrated a scheme between March 2016 and June 2018 to knowingly and willfully defraud a municipality in Puerto Rico of $9,000,000.00 assigned to the municipality by the Puerto Rico Legislature for the renovation and improvement of the municipality's trauma center. Exhibit D, pp. 1-3. The Federal Indictment alleges that Kirkland and his co-defendants, through the use of "multiple shell corporate entities and financial accounts" represented to the municipality that the $9,000,000.00 was being invested at a high rate of return, when in fact, the principal invested was transferred to defendants and used for "personal expenses and purchases of personal and real property." Exhibit E, p. 2. These purchases included, but were not limited to, "a marine vessel, jewelry, clothing, school tuition, restaurants, credit card payments, and home décor, as well as real estate improvements . . . and the payment of home mortgages." Exhibit D, p. 12. Kirkland and his co-defendants ultimately returned only $1,800,000.00 of the municipality's principal, falsely representing that amount to be a return on the original $9,000,000.00 investment. Exhibit D, p. 2.

    ii.     Cheng Pleads Guilty to Defrauding the Federal Government.

12.     In July 2015, a lawsuit was filed by the United States Government in which Cheng was alleged to have violated the False Claims Act (31 U.S.C. § 3729) in his role as a member and CFO of Blue Furniture Solutions, LLC. See, United States District Court of the Western District of Texas. See, United States ex rel. Univ. Loft Co. v. Blue Furniture Sols., LLC, No. 1:15-CV-588-LY, 2018 U.S. Dist. LEXIS 159506, at *1 (W.D. Tex. Sep. 18, 2018). The United States Government claimed that Cheng and his business partner, Yingqing Zeng ("Zeng"), engaged in a scheme of falsely identifying wooden furniture imported from the People's Republic of China on

6

documents submitted to the United States Customs Office in order to avoid millions of dollars in United States Customs "anti-dumping" fees and duties between 2011 and 2015. See, Id. at *3.

13.     On December 11, 2019, Cheng entered into a Settlement Agreement with the United States Government to settle the claims brought against him in <u>United States District Court of the Western District of Texas. See, United States ex rel. Univ. Loft Co. v. Blue Furniture Sols., LLC,</u> (the "Civil Settlement Agreement").  Under the terms of the Civil Settlement Agreement, Cheng agreed to pay a total of $90,000.00 over a five-year period, pursuant to the terms of a contemporaneously-executed promissory note.  To secure payment of the agreed-upon sum, Cheng executed a consent judgment in the amount of $4,679,987.19, to be filed by the United States Government in the event any of the Civil Settlement's payment terms were not met.  A true and accurate copy of the Civil Settlement Agreement is attached hereto as **Exhibit E**.

14.     Following the filing of the civil case in the Western District of Texas, Cheng and Zeng were criminally indicted for the same fraudulent behavior in the United States District Court of South Carolina on January 9, 2019.  According to the indictment, Cheng and Zeng submitted forms to the Department of Homeland Security that intentionally mislabeled furniture from the People's Republic of China between January 2015 and November 2015.  On December 18, 2019, Cheng entered into a plea agreement, whereby he pled guilty to violations of 18 U.S.C. §371 and 18 U.S.C. §542 in exchange for supervised release (the "Plea Agreement").  A true and accurate copy of the Plea Agreement is attached hereto as **Exhibit F**.

**B.     Cheng and Kirkland, acting on behalf of Dragon and Premier, respectively, conspire to defraud Zhang of approximately $1,200,000.**

15.     In or about September 2019, Cheng, an acquaintance of Zhang, and principal of Dragon, solicited Zhang to participate in a supposed Forex trading opportunity with Kirkland.

7

Cheng told Zhang that he (Cheng) had a long-standing investment relationship with Kirkland, and that Kirkland guaranteed returns of 2.6% and offered to return an investor's principal upon thirty (30) days' notice.

16.    Cheng proposed that Dragon and Zhang enter into a limited partnership for the limited purpose of investing in Forex trading through Kirkland's services.  On September 24, 2019, Zhang and Dragon entered into a Limited Partnership Agreement (the "Partnership Agreement") to form FXTrade . A true and accurate copy of the Limited Partnership Agreement is attached hereto as **Exhibit G**.  Under the terms of the Partnership Agreement, Dragon would act as general partner of FXTrade, with Zhang becoming the limited partner.

17.    As part of the Partnership Agreement, Dragon and Zhang contemporaneously executed a Discretionary Investment Management Agreement (the "Management Agreement").  A true and accurate copy of the Management Agreement is attached hereto as **Exhibit H.**  Under Section 1 of the Management Agreement, Zhang agreed to initially invest $700,000.00 in the partnership.  In return, Dragon agreed to assume "full liability for the financial and fiduciary oversight" of Zhang's Contribution to FXTrade.

18.    FXTrade then entered into a Trade Funding Placement Agreement (the "Trade Agreement") with Premier on October 3, 2019. A true and accurate copy of the Agreement is attached hereto as **Exhibit I**.

19.    Pursuant to the terms of the Agreement, FXTrade agreed to invest $700,000 with Premier (the "Placement Amount").  In return, Premier, acting as the "Placement Agent," promised a fixed rate of return at 2.6% of the Placement Amount per month.  The Placement Amount and any accrued proceeds were agreed to become fully due and payable by Premier following a "Minimum Period," defined by the Agreement as three (3) months after the initial investment date.

Following the Minimum Period, Premier promised to return the entire outstanding Placement Amount to Zhang within three (3) days of Premier's receipt of a written demand from FXTrade. Upon information and belief, Premier and Kirkland did not intend to actually invest Zhang's money in Forex trades and did not intend to ever return the principal investment to Zhang.

20.     On December 15, 2019, Premier sent an encouraging notice to FXTrade, which stated that Premier's "investment fund" had a total balance of $47,768,332.00 among its "eighty-nine (89) account holders" (the "December Notice"). A true and accurate copy of the December Notice is attached hereto as **Exhibit J**. Upon information and belief, the information on the December Notice was false.

21.     Over the following months, Zhang, through FXTrade, increased his investment with Premier under the Trading Agreement to an amount totaling approximately $1,200,000. On March 25, 2020, Dragon and Premier entered into a Collateralized Trade Funding Placement Agreement (the "Collateralized Trade Agreement"). A true and accurate copy of the Collateralized Trade Agreement is attached hereto as **Exhibit K**.

22.     Pursuant to the Collateralized Trade Agreement, Dragon, acting as general partner of FXTrade, invested a further $500,000 of Zhang's assets. Under the Collateralized Trade Agreement's terms, Premier was defined as both a "Placement Agent" and a "Trader." Pursuant to Section 1 of the Collateralized Trade Agreement, the Trader (Premier) was entitled to thirty-percent (30%) of the gross profits from each trade, and the Placement Agent (Premier), was entitled to either five-percent (5%), seven-percent (7%), or ten-percent (10%) of the gross profits for the applicable month, depending on the gross profits' relation to the total invested amount. Any remaining gross profits were to be distributed to FXTrade, the "Placement Provider."

23.     Under Section 4 of the Collateralized Trade Agreement, the entire principal balance of the invested amount, as well as any unpaid profits, would become due and payable to the investing party without further written demand on the ninetieth (90th) day following March 25, 2020.

24.     From the time of Zhang's initial investment with FXTrade in September 2019, through June 2020, Zhang received regular communications from Cheng purporting to show steady profits on the funds Zhang had invested.  On June 3, 2020, Cheng sent Zhang a ledger demonstrating that Zhang's "account" balance with FXTrade as of May 31, 2020 was $1,289,324.35.

25.     Upon information and belief, Premier and Kirkland did not intend to actually invest Zhang's assets in Forex trades and any purported trading activity was invented by Defendants to cover up Defendants' intended use for Zhang's assets in what was essentially a Ponzi scheme.

**C.      Cheng and Kirkland refuse to return Zhang's investment.**

26.     In or about June, 2020, Zhang contacted Cheng and requested FXTrade make a written demand to Premier, pursuant to the original Trade Agreement, for $820,000 of Zhang's total balance of $1,289,324.35 to be withdrawn and returned to Zhang.

27.     Instead, Kirkland and Cheng attempted to convince Zhang to either leave all of his principal investment with the Defendants or even to invest more with Defendants.  For example, on June 17, 2020, Kirkland sent an email to Cheng stating that if Zhang deposited more money with Kirkland, that Kirkland "will be able to provide a 2% hurdle rate. This means that if on any given month the performance is anything less than 2% a credit will be given to the account for the difference. In effect this guarantees a 2% minimum performance per month on all new deposits." Cheng forwarded Kirkland's email to Zhang, and told Zhang that this was an "incredible guaranty"

and encouraged Zhang to invest more with Kirkland. Cheng added: "Combined by the no loss guarantee, I can't see any other Investment can give you better and more secured return. Remember, this is NOT a flat return, but a guaranteed MINIMUM return. If the actual Net return is higher than 2%, we will get the higher return."

28.     After numerous delays, Cheng informed Zhang that, despite statements showing consistent earnings and a large balance on Zhang's "accounts," FXTrade did not have sufficient funds to honor Zhang's withdrawal request of $820,000.

29.     On August 17, 2020, Kirkland informed Cheng and Zhang that FXTrade's investment with Premier had been completely lost months earlier in March 2020, purportedly as a result of fluctuations in foreign trade markets following the COVID-19 outbreak. Regarding the ledgers sent to Zhang in the intervening months, Kirkland alleged that the large account balances reflected on those ledgers were only "trade credits," and not actual cash available for distribution. It is unclear what Kirkland means by a "trade credit."

30.     Upon information and belief, Defendants created false "account statements" to encourage Zhang to keep his assets "invested" with Defendants. Upon information and belief, the purported investment gains and account balance shown on these "account statements" were fictional – invented by Defendants to conceal their misappropriation of Zhang's assets for Defendants' own use.

31.     Even after telling Zhang in August 2020 that his investment had been completely lost – despite having represented to Zhang for months thereafter that his account was increasing in value with significant gains each month – Kirkland and Cheng encouraged Zhang to let Kirkland somehow win Zhang's money back on purported Forex trades that Kirkland stated he was "expecting to pay out…on or before December 2020; which will provide enough cash once applied

to trade to greatly assist in the recovery of your accounts." Kirkland went on to indicate he would continue to pay Zhang interest on his investment even though Kirkland had just said that the investment had been completely lost: "As for the cash flow before December, I can project 1% per month based on your balance, to be paid out as it's generated." Upon information and belief, Defendants made these representations to attempt to buy more time to find other investors in Defendants' fraudulent scheme, so that they could use the "new money" to repay old investors, like Zhang.

32. To date, Zhang has yet to recover any of the $1,200,000 Placement Amount from Defendants, despite Premier's guaranteed promised returns of 2.6% at the time of investment and the passing of all required waiting periods stipulated verbally by Defendants and under the Trade Agreement and Collateralized Trade Agreement, and repeated promises from Cheng and Kirkland that Zhang's funds were available on demand and would be returned in full.

## FIRST CLAIM FOR RELIEF
### (Fraud- Kirkland and Premier)

33. The foregoing allegations are realleged and incorporated herein by reference.

34. Acting as Premier's principal, Kirkland made false representations and guarantees regarding investment opportunities with Premier.

35. Specifically, Kirkland told Zhang at a meeting at a restaurant in the Atlanta, Georgia area called 678 Korean BBQ on or about September 28, 2019 that Zhang would realize a guaranteed fixed rate of return if he invested with Kirkland and Premier, that Zhang's principal investment would be available to be returned on demand, and that there was no risk of loss from such an investment.

36. At a subsequent meeting at the same restaurant on or about May 29, 2020, Kirkland told Zhang that his account was increasing in value and his investment was safe.

12

37.     Kirkland and Premier stated in the Trade Agreement that FXTrade's investments would have guaranteed fixed return rate of 2.6%. Exhibit I, p. 1.  To date, Zhang has not received a return on FXTrade's investment with Premier, nor has Zhang received any verifiable record that that FXTrade's investment with Premier has accrued value.

38.     Kirkland and Premier represented in the Trade Agreement that the full principal investment could be withdrawn by FXTrade upon three-days written notice after the three-month Minimum Periods ended. Exhibit I, pp. 1-2.  Kirkland and Premier refused to return Zhang's investment of more than $1,200,000 when Zhang properly demanded the return of the balance in accordance with the Trade Agreement and Collateralized Trade Agreement's terms.

39.     In the Collateralized Trade Agreement, used to induce Zhang to invest an additional $500,000.00 with Premier, Kirkland and Premier guaranteed protections from trade losses through a "Stop Trigger" clause, which guaranteed the cessation of trading upon a 10% loss suffered on any trade, as well as a $50,000.00 "Collateral for Recourse to Trade Loss," available to FXTrade following the event of a "Stop Trigger." Exhibit K, p. 2.  Upon information and belief, no trade was occurring and these representations were made by Kirkland to extract more assets from Zhang, with no intention of returning Zhang's investment.

40.     Kirkland's office sent periodic balance updates to FXTrade and Zhang, claiming that Zhang's investment was growing as promised by Kirkland prior to Zhang's investment. Additionally, Kirkland sent documentation on Premier letterhead to FXTrade and Zhang claiming Premier had achieved general growth across all eighty-nine (89) of Premier's alleged client's accounts, with investments supposedly totaling near $50,000,000.00. Exhibit J.  Upon information and belief, the information in these balance updates were false and created to deceive Zhang.

41.     Zhang was induced to invest in FXTrade and participate in the Forex trading program through the aforementioned guarantees provided by Kirkland and Premier.

42.     Kirkland's recorded history of inducing investors through nearly-identical fraudulent representations demonstrate a pattern of intentional behavior intended to mislead and defraud investors.   In the Federal Indictment in the District of Puerto Rico, the grand jury found that the money collected by Kirkland's previous investors was never traded, but used on personal expenses. Exhibit D, p. 12.  Upon information and belief, Zhang's assets were disposed of in a similar fashion.

43.     Kirkland and Premier's above-described statements were false when made.

44.     Kirkland and Premier intended Zhang to rely upon the false statements described above.

45.     Zhang in fact reasonably relied upon Kirkland and Premier's false statements in making his investments directly and indirectly with Kirkland and Premier, because of Kirkland and Premier's supposed expertise and experience in the Forex trading field.

46.     As a result of Kirkland and Premier's false representations, Zhang has suffered damages in an amount to be determined at trial, but not less than $75,000.

47.     In addition, Zhang is entitled to punitive damages for Kirkland and Premier's willful and wanton conduct, in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
**(Fraud- Cheng, Dragon and FXTrade)**

48.     The foregoing allegations are realleged and incorporated herein by reference.

49.     Upon information and belief, Cheng knew, or should have known, of Kirkland's previous fraudulent investment activities, including the full collateral bar issued against Kirkland by the SEC in 2015.

14

50.     In or about September 2019, including phone calls and meetings, including a meeting near Atlanta, Georgia at a restaurant called 678 Korean BBQ on or about September 28, 2019, Cheng, acting as Dragon's principal and FXTrade's general partner, solicited Zhang's investment by communicating the existence of his long-standing business relationship with Kirkland.  Cheng expressed to Zhang that Cheng's trading experiences with Kirkland had been profitable, that Kirkland offered a guaranteed rate of return, that Kirkland would return Zhang's principal investment on demand, and that there was no risk of loss investing with Kirkland.

51.     Additionally, Cheng conveyed the false representations and guarantees Kirkland and Premier offered to secure Zhang's investment with FXTrade.  Based on Cheng's claim of a "long-standing business relationship" with Kirkland, Cheng knew or should have known that Kirkland's representations regarding the Trade Agreement were false.

52.     After Zhang's investment with FXTrade, Dragon entered into the Trade Agreement and Collateralized Trade Agreement with Premier on FXTrade's behalf.   Over the following year, Cheng continued to deliver ledgers and communications to Zhang, which misrepresented the profitability, current balance, and availability of Zhang's accounts with FXTrade and Premier.

53.     Cheng's false misrepresentations regarding Kirkland's fitness as an investment advisor and the Forex trading plan induced Zhang to invest in FXTrade.  Cheng's continued communications and false representations regarding the investment's performance further induced Zhang to continue participation in the program.

54.     Cheng, Dragon, and FXTrade's above-described statements were false when made.

55.     Cheng, Dragon, and FXTrade intended Zhang to rely upon the false statements described above.

15

56. Zhang in fact reasonably relied upon Cheng, Dragon, and FXTrade's false statements in making his investments directly and indirectly with Cheng, Dragon, and FXTrade, because of Cheng's supposed experience investing with Kirkland and Premier.

57. As a result of Cheng, Dragon, and FXTrade's false representations, Zhang has suffered damages in an amount to be determined at trial, but not less than $75,000.

58. In addition, Zhang is entitled to punitive damages for Cheng, Dragon, and FXTrade's willful and wanton conduct, in an amount to be determined at trial.

### ALTERNATIVE SECOND CLAIM FOR RELIEF
**(Negligent Misrepresentation- Cheng, Dragon and FX Trade)**

59. The foregoing allegations are realleged and incorporated herein by reference.

60. As described more fully above, Cheng, acting as principal of Dragon and general partner of FXTrade, made numerous false representations to Zhang regarding the fitness of Kirkland as an investment advisor and the profitability and risk profile of the Forex trading program. Cheng cited a long-standing business relationship with Kirkland and personal success in Kirkland's investment programs.

61. Zhang justifiably relied upon Cheng's representations, as someone who had personally invested with Kirkland in prior dealings.

62. In light of Cheng's long-standing investment relationship with Kirkland, Cheng knew, or should have known, about Kirkland's history of deceptive and fraudulent investment practices.

63. As the managing partner of FXTrade, Cheng had a duty to prepare and investigate the information presented to Zhang, the limited partner, with reasonable care.

16

64.     As a direct and proximate result of Cheng and Dragon's negligent misrepresentations, Zhang has suffered damages in an amount to be determined at trial, but not less than $75,000.

## THIRD CLAIM FOR RELIEF
**(Commodities Fraud under 7 U.S.C. 6b and 6o – Cheng, Dragon and FXTrade)**

65.     The foregoing allegations are realleged and incorporated herein by reference.

66.     Cheng, acting as Dragon's principal, provided Zhang trading advice for a fee. Specifically, Cheng recommended Zhang invest $1,200,000 in Forex trading at a promised fixed rate of return of 2.6% of the Placement Amount per month.  Under the Management Agreement, Cheng and Dragon received compensation for services rendered as the general partner of FXTrade.

67.     Zhang deposited with Cheng money in connection with an order to make a contract of sale of commodities for future delivery.  Specifically, Zhang invested $1,200,000 with FXTrade for the purpose of Forex trading.

68.     Cheng, Dragon and FXTrade committed fraud in violation of provisions of the CEA.

69.     Cheng, Dragon and FXTrade violated 7 U.S.C. § 6b by defrauding Zhang in, or in connection with an order to make, a contract of sale of a commodity for future delivery.

70.     Cheng, Dragon and FXTrade violated 7 U.S.C. § 6o, by employing a device, scheme, or artifice to defraud Zhang and by engaging in a transaction, practice, or course of business which operated as a fraud or deceit upon Zhang.

71.     Upon information and belief, Cheng knew, or should have known, of Kirkland's previous fraudulent investment activities, including the full collateral bar issued against Kirkland by the SEC in 2015.

72.     As described more fully above, in or about September 2019, Cheng, acting as Dragon's principal, solicited Zhang's investment by communicating the existence of his long-standing business relationship with Kirkland.  Additionally, Cheng conveyed the false representations and guarantees Kirkland and Premier offered to secure Zhang's investment with FXTrade.

73.     After Zhang's investment with FXTrade, Dragon entered into the Trade Agreement and Collateralized Trade Agreement with Premier on FXTrade's behalf.   Over the following year, Cheng continued to deliver ledgers and communications to Zhang, which misrepresented the balance and availability of Zhang's accounts with FXTrade and Premier.

74.     As a result of Cheng and Dragon's false representations, Zhang has suffered damages in an amount to be determined at trial, but not less than $75,000.

## FOURTH CLAIM FOR RELIEF
**(Securities Fraud under 10b-5(a) and (c) – Cheng, Dragon and FXTrade)**

75.     The foregoing allegations are realleged and incorporated herein by reference.

76.     Cheng, acting as Dragon's principal, induced Zhang to enter into a limited partnership through a fraudulent scheme in violation of Section 10(b) of the Securities Exchange Act and Rule 10b-5 thereunder.

77.     Upon information and belief, Cheng knew, or should have known, of Kirkland's previous fraudulent investment activities, including the full collateral bar issued against Kirkland by the SEC in 2015.

78.     In or about September 2019, Cheng, acting as Dragon's principal, solicited Zhang's investment in FXTrade by communicating the existence of his long-standing business relationship with Kirkland. Additionally, Cheng conveyed the false representations and guarantees Kirkland and Premier offered to secure Zhang's investment in FXTrade.

18

79. Zhang did not know, nor through reasonable means should have known, that the statements offered by Cheng and Dragon were untrue.

80. On September 24, 2019, in reliance upon these manipulative and deceptive acts, Zhang entered into the Partnership Agreement with Dragon, thereby forming FXTrade, with an initial investment by Zhang of $700,000.

81. Under the Partnership Agreement, Dragon would act as general partner, with Zhang operating as a limited partner. Cheng, acting as Dragon's principal, controlled and managed FXTrade.

82. Zhang's expectation of profits from his investment in FXTrade was based solely upon the efforts and representations of Cheng, acting as the principal of Dragon.

83. In its managing partner capacity, Dragon entered into the fraudulent Trade Agreement with Premier using Zhang's assets in FXTrade.

84. As a result of Defendants' fraudulent scheme, Zhang has suffered damages in an amount to be determined at trial, but not less than $75,000.

## FIFTH CLAIM FOR RELIEF
### (Civil Conspiracy - All Defendants)

85. The foregoing allegations are realleged and incorporated herein by reference.

86. Upon information and belief, Cheng and Kirkland, individually and on behalf of Dragon, FXTrade, and Premier, conspired to defraud Zhang such that each Defendant should be held jointly and severally liable for the tortious acts of the other Defendants.

87. Cheng induced Zhang to invest with Premier's Forex trading fund by asserting a long-standing business relationship with Kirkland as an investment agent. Together, Cheng and Kirkland conveyed misrepresentations and false guarantees about the prospects of an investment with Premier's Forex trading fund to Zhang.

19

88.     Once Zhang had entered into a Limited Partnership with Dragon to create TradeFX, Dragon entered into the Trading Agreement and Collateralized Trade Agreement on TradeFX's behalf using Zhang's funds.  Under the terms of these agreements, both Kirkland and Cheng made regular profits from Zhang's investment.

89.     When Zhang requested the return of his $1,200,000.00 investment, Cheng and Kirkland, individually and on behalf of Dragon, FXTrade, and Premier, refused to return Zhang's funds, both citing alleged trade losses in foreign markets.

90.     As a result of the scheme created by Cheng and Kirkland, carried out through the actions of Dragon, Premier, and FXTrade, Zhang has suffered damages in an amount to be determined at trial, but not less than $75,000.

**SIXTH CLAIM FOR RELIEF**
**(Breach of Fiduciary Duty - Cheng and Dragon)**

91.     The foregoing allegations are realleged and incorporated herein by reference.

92.     As the general partner of FXTrade, Dragon had a fiduciary duty to act in the best interest of FXTrade's limited partner, Zhang.

93.     Through the conduct described above, Cheng, acting as Dragon's principal, breached the fiduciary duties owed to Zhang.

94.     Specifically, Cheng wasted Zhang's assets by investing Zhang's assets with Premier when Cheng knew, or reasonably should have known, that Premier's investment opportunities were fraudulent.  Additionally, upon information and belief, Cheng violated the duty of loyalty through misappropriating Zhang's funds and personally profiting from FXTrade's investment with Premier at Zhang's expense.

95.     As a result of Dragon's breach of fiduciary duty, Zhang has suffered damages in an amount to be determined at trial, but not less than $75,000.

## SEVENTH CLAIM FOR RELIEF
### (Breach of Fiduciary Duty - Kirkland and Premier)

96.     The foregoing allegations are realleged and incorporated herein by reference.

97.     As a broker of FXTrade's investment, and through the special relationship of confidence and trust entrusted in it, Premier owed fiduciary duties to FXTrade and its limited partner, Zhang.  Kirkland knew that the source of all of the FXTrade investment funds was Zhang, and Kirkland knew that Zhang had reposed trust and confidence in Kirkland based upon the expertise that Kirkland represented he had in Forex trading.

98.     Through the conduct described above, Kirkland, acting as Premier's principal, breached the duties of care and loyalty by misappropriating Zhang's investment to Premier and Kirkland's own benefit.

99.     As a result of Premier's breach of fiduciary duty, Zhang has suffered damages in an amount to be determined at trial, but not less than $75,000.

## EIGHTH CLAIM FOR RELIEF
### (Piercing the Corporate Veil - Cheng and Kirkland)

100.     The foregoing allegations are realleged and incorporated herein by reference.

101.     Upon information and belief, Cheng is the sole member and manager of Dragon.

102.     Upon information and belief, Cheng exercised complete domination and control over Dragon, such that Dragon is the alter-ego of Cheng.

103.     Upon information and belief, Cheng has not observed corporate formalities in regard to Dragon, and has under-capitalized Dragon.

104.     Upon information and belief, Cheng has used Dragon as a corporate shield from personal liability for the fraudulent activities Cheng has conducted under Dragon's name.

105.     Upon information and belief, Kirkland is the manager of Premier.

21

106.    Upon information and belief, Kirkland exercised complete domination and control over Premier, such that Premier is the alter-ego of Kirkland.

107.    Upon information and belief, Kirkland has not observed corporate formalities in regard to Premier, and has under-capitalized Premier.

108.    For the above-mentioned reasons, Cheng and Kirkland should be held individually liable for their actions as principals of Dragon and Premier, respectively.

**WHEREFORE**, Zhang respectfully prays:

A.  That the Court award Zhang damages against Dragon, Premier, FXTrade, Cheng and Kirkland in an amount to be determined at trial, but not less than $75,000.

B.  That the Court grant Zhang punitive damages for defendants willful and wanton conduct;

C.  That the Court award Zhang his reasonable attorneys' fees incurred in this action to the full extent allowable by law;

D.  That the Court tax the cost of this action against Defendants;

E.  That the Court grant Zhang a trial by jury on all issues so triable; and

F.  That the Court grant such other and further relief to Zhang as the Court deems just and proper.

22

This the 9th day of April, 2021.

RAYBURN COOPER & DURHAM, P.A.

By: /s/Ross R. Fulton
     Ross R. Fulton (N.C. State Bar No. 31538)
     Natalie Kutcher (N.C. State Bar No. 54888)
     227 West Trade Street, Suite 1200
     Charlotte, NC 28202
     Telephone: (704) 334-0891
     Facsimile: (704) 377-1897
     rfulton@rcdlaw.net
     nkutcher@rcdlaw.net

     *Attorney for Plaintiff*