## LIMITED PARTNERSHIP AGREEMENT

This Agreement of Limited Partnership is made effective as of **September 24, 2019**, by and between **Dragon Capital Group LLC, a Wyoming Limited Liability Company** (hereinafter referred to as "General Partner"), and **Xuejun (Mark) Zhang, an Individual resides in the state of North Carolina** (hereinafter individually referred to as "Limited Partner" and collectively referred to as "Limited Partners").

IT IS HEREBY AGREED:

### ARTICLE I
### THE PARTNERSHIP

1.1     Name of Partnership. The name of the Partnership shall be **"FXTRADE ZH LP"**, a Nevada Limited Partnership." The business of the Partnership shall be conducted under that name.

1.2     Purpose of Partnership. The Partnership shall engage in the business of Forex Trading and such activities as are related or incidental thereto.

1.3     Principal Place of Business. The principal executive office of the Partnership shall be at 128 S. Tryon St, #20-111, Charlotte, NC 28202, or at such other place as may be determined from time to time by the General Partner. If the General Partner changes the executive office of the Partnership, he shall give written notice of the change of address to each Limited Partner at least thirty (30) days before that change.

1.4     Term of Partnership. The term of the Partnership commenced on September 24, 2019 and shall continue for a period of thirty (30) years unless sooner dissolved as hereinafter provided.

1.5     Certificate of Limited Partnership. The General Partner shall immediately execute a Certificate of Limited Partnership and cause that Certificate to be filed in the office of the Secretary of State of California. Thereafter, the General Partner shall execute and cause to be filed certificates of amendment of the Certificate of Limited Partnership whenever required by the California Revised Limited Partnership Act or this Agreement.

1.6     Glossary of Terms. Except as otherwise stated in this Agreement or as the context of this Agreement requires, the terms defined in this Section shall, for the purposes of this Agreement, have the meanings herein specified.

1

$X Z$  $SC$

A.     "Agreement" shall mean this Limited Partnership Agreement, as amended from time to time.

B.     "Assignee" shall mean a person who has acquired beneficial interest in the limited partnership interest of a Limited Partner but who is not a "Substituted Limited Partner."

C.     "Assigning Partner" shall mean a Partner who has assigned a beneficial interest in that Partner's partnership interest, the Assignee of which has not become a "Substituted Limited Partner."

D.     "Limited Partner" shall refer to any person who is admitted to the Partnership, either as an Original Limited Partner or as a Substituted Limited Partner.

E.     "Net income" and "net loss" shall mean the net income or net loss of the Partnership as determined for the purpose of computing federal income taxes pursuant to the Internal Revenue Code.

F.     "Partners" or "the Partners" shall refer collectively to the General Partner and the Limited Partners.  Reference to "Partner" shall be a reference to each of the Partners.

G.     "Partnership" shall refer to the Limited Partnership created under this Agreement and the Certificate of Limited Partnership to be filed with the Office of the Secretary of State pursuant to the California Revised Limited Partnership Act.

## ARTICLE II
## MEMBERS OF PARTNERSHIP

2.1     Original General Partners. The name of the General Partner is Dragon Capital Group LLC.

2.2     Original Limited Partners.  The names of each original Limited Partner are as follows:
         Xuejun (Mark) Zhang

2.3     Admission of Additional General Partners.  Subject to any other provision of this Agreement, a person or entity may be admitted as a General Partner after the Certificate of Limited Partnership is filed only with the written consent of each General Partner and the vote or written consent of fifty-one percent (51%) of all General Partners.

2.4     Admission of Additional Limited Partners.  Subject to the provisions of Article IX of this Agreement, governing transfers of Partnership interests, a person may acquire an interest

2

X Z   SC

in the Partnership directly from the Partnership and be admitted as an Additional Limited Partner only with the approval of the General Partner and fifty-one percent (51%) of all Partners. Each Partner's interest will be proportionally reduced to admit the new Limited Partner.

2.5     Admission of Substituted Limited Partner. The assignee of a limited partnership interest may be admitted as a Substituted Limited Partner only with the written consent of the General Partner.

2.6     Additional Partners Bound by Agreement. Before any person is admitted to the Partnership as a General or Limited Partner, that person shall agree in writing to be bound by all of the provisions of this Agreement.

## ARTICLE III
### FINANCING

3.1     Capitalization. The Partnership shall have a total initial capitalization of up to One Million Dollars ($1,000,000.00). The General Partner and Limited Partners shall initially contribute the amounts set forth opposite their respective names on Exhibit A.

3.2     Additional Capital Contributions.

A.     The General Partner may determine the amount of additional capital required by the Partnership and may require each Partner, General and Limited,1 to contribute a proportionate share of additional capital to the Partnership. The General Partner's determination will be binding on all Partners, unless sixty-seven percent (67%) of all Partners vote otherwise. Each Partner's proportionate share of additional capital shall be defined as the product of the total amount of additional capital required by the Partnership multiplied by that Partner's "percentage interest in profits and losses" as set forth in Exhibit A. Additional capital contributions shall be made in cash by each Partner to the Partnership within ten (10) days after written notice of the amount of additional capital contributions has been delivered to each Partner (said notice hereinafter referred to as "Call Notice").

B.     In the event that any Partner fails to contribute any additional capital contribution required hereunder within ten (10) days after the Call Notice, then that Partner shall be in default under this Agreement. Any Partner who is in default under this Agreement for

3

X Z  SC

failing to contribute the additional capital contributions required hereunder shall have ninety (90) days from the date of delivery the Call Notice in which to cure that default by contributing his share of the required additional capital contributions and by paying to the non-defaulting Partners, in proportion to their percentage interests in profits and losses, an amount equal to one percent (1%) of the defaulting Partner's additional capital contribution for each day he has failed to contribute such additional capital contributions commencing with the eleventh (11th) day after delivery of the Call Notice, as liquidated damages. Each Partner specifically agrees to pay any such liquidated damages which may become due as a result of his/her/its default hereunder and further agrees that these damages constitute a reasonable estimate of the amount of actual damages which may be suffered by the other Partners. So long as a Partner is in default hereunder, he shall have no voting rights but shall receive notice of any meetings.

        C.      If any Partner is in default under Subsection 3.2B hereunder and fails to cure the default within ninety (90) days of the Call Notice by contributing the additional required capital and by paying the liquidated damages as above provided, then such Partner shall be in breach of this Agreement.

        D.      If any Partner is in breach of this Agreement pursuant to Subsection 3.2(c), then at the option of the Partnership, his interest in the Partnership shall be terminated and he shall become an unsecured creditor for an amount equal to his original capital contribution decreased by the sum of:

        1.      his proportionate share of all losses previously incurred by the Partnership (excluding depreciation);

        2.      the liquidated damages accruing to the other Partners under Subsection 3.2(b); and

        3.      by any distributions previously made to said defaulting Partner.

This debt shall be evidenced by an unsecured promissory note executed in the name of the Partnership and shall be payable with interest at the rate of nine percent (9%) in sixty (60)

4

X Z   SC

Doc ID: a5d314a60525923113c08e5a6bd912353c4d9347

equal monthly installments, interest included. If the Partnership sells the Project, then this note shall be all due and payable.

        E.      If any Partner is in breach of this Agreement pursuant to Subsection 3.2(c), and if he has a deficit balance in his capital account, then, at the option of the Partnership, his interest in the Partnership shall be terminated and he shall pay an amount equal to the deficit balance in his capital account (computed without regard to depreciation) to the Partnership within thirty (30) days after date of the breach. If payment is not made within said thirty (30) day period, interest shall accrue thereafter at eighteen percent (18%) per annum or the highest legal rate under California law until paid in full. If any former Partner fails to pay the amount due to the Partnership pursuant to this Subsection 3.2(e), the Partnership or any individual Partner may proceed with action for collection.

        F.      As an alternative to terminating the Partner's interest as provided in Subsections 3.2(d) or 3.2(e), the Partnership may elect to sue for breach of this Partnership Agreement. Partners acknowledge and agree that the terms and provisions of Subsections 3.2(d) and 3.2(e) are fair and reasonable and agree to be bound by the terms thereof. Each Partner hereby waives the requirement that a dissolution and accounting must occur before an action may be maintained by a Partner or the Partnership against a Partner.

    3.3    <u>Interest in Contributions</u>.   No interest shall be paid on a Partner's capital contributions.

    3.4    <u>Withdrawal and Return of Capital</u>.

        A.      No Partner may withdraw any portion of the capital of the Partnership and no Partner shall be entitled to the return of that Partner's contribution to the capital of the Partnership except upon dissolution of the Partnership.

        B.      No Partner shall be entitled to demand the distribution of Partnership property other than cash as part of the return of that Partner's capital account on dissolution.

        C.      No Partner shall have a priority over any other Partner as to the return of his capital account upon the dissolution of the Partnership.

Doc ID: a5d314a60525923113c08e5a6bd912353c4d9347

## ARTICLE IV
## ALLOCATION AND DISTRIBUTION OF PROFITS AND LOSSES

4.1     Allocation of Profits and Losses.   The net income of the Partnership shall be allocated to, and any net losses suffered by the Partnership shall be borne by, the Partners in the proportions set forth in Exhibit A attached hereto and incorporated herein by this reference.

4.2     Distribution of Cash Available for Distribution.   The General Partner shall determine the amount of any distribution to the Partners and the timing of all such distributions. The General Partner's determination shall be binding upon all Partners.

4.3     Priorities Among Partners.   No Partner shall be entitled to any priority or preference over any other Partner as to any distribution from the Partnership.

## ARTICLE V
## MANAGEMENT OF PARTNERSHIP AFFAIRS AND VOTING RIGHTS

5.1     Control and Management.   Except as otherwise set forth in this Agreement, **the General Partner shall have sole and exclusive control of the Limited Partnership**.   The General Partner shall have the power and authority to take such action from time to time as he may deem to be necessary, appropriate, or convenient in connection with the management and conduct of the business and affairs of the Partnership, including without limitation the power to:

A.     Acquire property, including real or personal property, for the use of the Partnership upon such terms and conditions as the General Partner may, from time to time, determine to be advantageous to the Partnership;

B.     Finance the Partnership's activities by borrowing money from third parties on such terms and under such conditions as the General Partner deems appropriate.   When money is borrowed for Partnership purposes, the General Partner shall be, and hereby is, authorized to pledge, mortgage, encumber, or grant a security interest in Partnership properties as security for the repayment of such loans.

C.     Employ, retain, or otherwise secure the services of such personnel or firms deemed necessary by the General Partner for or to facilitate the conduct of Partnership business affairs, all on such terms and for such consideration as the General Partner deems advisable; and\

D.     Take any and all other action which is permitted by law and which is customary in or reasonably related to the conduct of the Partnership business or affairs.

6

5.2     Voting Rights of Limited Partners.

    A.     Except as provided in Subsection 5.2(b), the Limited Partners shall not have either the obligation or the right to take part, directly or indirectly, in the active management or control of the business of the Partnership.

    B.     The following Partnership actions may only be taken after approval by vote of the Partners:

    1.     Veto of a call for additional capital as set forth in Section 3.2;
    2.     Admission of an additional Limited Partner under Section 2.4;
    3.     Amendment of the Partnership Agreement as provided in Subsection 13.2;
    4.     The sale or transfer of the Project;
    5.     Approval of Partner loans pursuant to Section 7.3;
    6.     Consent to dissolution under Section 12.2; and
    7.     Election of a new general partner under Section 12.3.

    C.     Except where otherwise expressly set forth in this Agreement, all of the acts listed in Section 5.2(b)(i) through 5.2(b)(vii) shall be approved by sixty-seven percent (67%) vote of the interests of the Partners, each Partner having one vote for each one percent (1%) interest in profits and losses owned by that Partner with the General Partner having the same voting rights as a Limited Partner.

5.3     Standard Care of General Partner.   The General Partner shall exercise ordinary business judgment in managing the affairs of the Partnership.  Unless fraud, deceit, or a wrongful taking is involved, the General Partner shall not be liable or obligated to the Limited Partners for any mistake of fact or judgment made by the General Partner in operating the business of the Partnership that results in any loss to the Partnership or its Partners.  The General Partner does not, in any way, guarantee the return of the Limited Partners' capital or a profit from the operations of the Partnership.  The General Partner shall not be responsible to any Limited Partner because of a loss of that Partner's investment or a loss in operations, unless it has been occasioned by fraud, deceit, or a wrongful taking by the General Partner.

7

XZ  SC

5.4 Removal of General Partner. The General Partner may not be removed by the Limited Partners.

ARTICLE VI
BOOKS, RECORDS, AND ACCOUNTS

6.1 Partnership Accounting Practices.

A. The Partnership books shall be kept on a cash basis. The Partnership books shall be closed and balanced at the end of each fiscal year of the Partnership.

B. The fiscal year-end of the Partnership shall be December 31.

6.2 Maintenance of Records and Accounts. At all times, the General Partner shall maintain or cause to be maintained true and proper books, records, reports, and accounts in which shall be entered fully and accurately all transactions of the Partnership.

6.3 Required Records. The General Partner shall maintain at the principal executive office of the Partnership within California all of the following records:

A. A current list of the full name and last known business or residence address of each Partner, set forth in alphabetical order, together with the contribution and share in profits and losses of each Partner.

B. A copy of the Certificate of Limited Partnership and all Certificates of Amendment thereto, together with executed copies of any powers of attorney pursuant to which any such Certificate has been executed.

C. Copies of the Limited Partnership's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years.

D. Copies of this Agreement and all duly adopted amendments thereto.

E. Financial statements of the Partnership for the six (6) most recent fiscal years.

F. The Partnership's books and records for at least the current and past three (3) fiscal years.

6.4 Delivery of Records to Limited Partners. Upon the request of any Limited Partner, the General Partner shall promptly deliver to that Partner, at the expense of the Partnership, a copy of:

XZ SC

A. The current list of each Partner's name, address, contribution, and share in profits and losses.

B. The Certificate of Limited Partnership, as amended, and any powers of attorney pursuant to which any such Certificate was executed.

C. This Agreement, as amended.

6.5 <u>Access to Records by Limited Partners</u>. Each Limited Partner and/or each Limited Partner's duly authorized representative, attorney, or attorney-in-fact shall have the right, upon reasonable request, to:

A. Inspect and copy, during normal business hours, any Partnership records the Partnership is required to maintain, pursuant to Sections 6.2 and 6.3 of this Agreement.

B. Obtain from the General Partner, promptly after becoming available, a copy of the Limited Partnership's federal, state, and local income tax or information returns for each year.

6.6 <u>Income Tax Data</u>. The General Partner shall send to each Partner, within ninety (90) days after the end of each taxable year, a copy of the Partnership's federal, state, and local income tax or information returns for such taxable year, together with such additional information as is necessary for them to complete their federal and state income tax or information returns for that year.

6.7 <u>Capital Accounts</u>. An individual capital account shall be maintained for each Partner. A capital account shall consist of a Partner's contribution to the initial capital of the Partnership, any additional contributions to the Partnership capital made by a Partner pursuant to this Agreement, and any amounts transferred thereto from that Partner's income account pursuant to this Agreement.

6.8 <u>Income Accounts</u>. An individual income account shall be maintained for each Partner. At the close of each Partnership taxable year, or at more frequent intervals, each Partner's share of the net profits or net losses of the Partnership shall be credited or debited to, and that Partner's distributions received during each fiscal year shall be deducted from, that Partner's income account and any resulting balance or deficit shall be transferred to or charged against that Partner's capital account.

6.9 <u>Banking</u>. The General Partner shall open and thereafter maintain a separate bank account in the name of the Partnership in which there shall be deposited all the funds of the

9



Partnership. No other funds shall be deposited in the account. The funds in that account shall be used solely for the business of the Partnership, and all withdrawals therefrom are to be made only on checks signed by the General Partner.

<center>ARTICLE VII
RIGHTS, DUTIES AND RESTRICTIONS OF PARTNERS</center>

7.1     <u>Devotion of Time by General Partner</u>. The General Partner shall devote such care, attention, and business capacity to the affairs of the Partnership as may be reasonably necessary. In this connection, the Partners hereby acknowledge that any General Partner may be the Manager or General Partner of other partnerships and may continue to manage other partnerships, and may continue to engage in other related business, whether or not competitive with the business of the Partnership.

7.2     <u>(Removed)</u>

7.3     <u>Loans to the Partnership</u>. No Partner shall loan any money to the Partnership unless approved by a fifty-one percent (51%) vote of all Partners.

7.4     <u>Transaction of Business with Partnership</u>. Except as otherwise provided in this Agreement, a Partner may transact other business with the Partnership. If any Partner transacts business with the Partnership, that Partner shall have the same rights and obligations with respect thereto as a person who is not a Partner.

<center>[Remining part of this page is left blank intentionally]</center>

10



7.5 <u>Partners Engaging in Other Business</u>. Any of the Partners may engage in or possess an interest in other business ventures of every nature and description independently or with others, and neither the Partnership nor the Partners shall have any right by virtue of this Agreement in and to any such independent ventures or to the income or profits derived therefrom.

<div align="center">

ARTICLE VIII

PARTNERSHIP MEETINGS

</div>

8.1 <u>Call and Place of Meetings</u>. Meetings of the Partners at the Principal Executive Office of the Partnership may be called pursuant to the written request of any Partner.

8.2 <u>Notice of Meeting</u>. Immediately upon receipt of a written request stating that the Partner or Partners request a meeting on a specific date (which date shall not be less than ten (10) nor more than sixty (60) days after the receipt of the request by the General Partner), the General Partner shall immediately give notice to all Partners. Valid notice may not be given less than ten (10) nor more than sixty (60) days prior to the date of the meeting, and shall state the place, date, and hour of the meeting and the general nature of the business to be transacted. No business other than the business stated in the notice of the meeting may be transacted at the meeting. Notice shall be given by mail, addressed to each Partner entitled to vote at the meeting at the address appearing in the books of the Partnership for the Partner.

8.3 <u>Quorum</u>. At any duly held or called meeting of Partners, Partners holding at least fifty-one percent (51%) of the voting power who are represented in person or by proxy shall constitute a quorum for all purposes other than amending this Agreement in which case seventy-five percent (75%) of the interests of all Partners shall be required. The Partners present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of enough Partners to leave less than a quorum, if any action taken, other than adjournment, is approved by the requisite percentage of interests of Partners.

8.4 <u>Meetings Not Duly Called, Noticed, or Held</u>. The transaction of business at any meeting of Partners, however called and noticed, and wherever held, shall be as valid as though consummated at a meeting duly held after regular call and notice, if a quorum is present at that meeting, either in person or by proxy, and if, either before or after the meeting, each of the

<div align="center">11</div>



persons entitled to vote, not present in person or by proxy, signs either a written waiver of notice, a consent to the holding of the meeting, or an approval of the minutes of the meeting.

8.5 <u>Waiver of Notice</u>. Attendance of a Partner at a meeting shall constitute waiver of notice, except when that Partner objects, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be described in the notice of the meeting and not so included, if the objection is expressly made at the meeting. Any Partner approval at a meeting shall be valid only if the general nature of the proposal is stated in any written waiver of notice.

8.6 <u>Consent to Action Without Meeting</u>. Any action that may be taken at any meeting of the Partners may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by Partners having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Partners entitled to vote thereon were present and voted. In the event the Partners are requested to consent to a matter without a meeting, each Partner shall be given notice of the matter to be voted upon in the manner described in Section 8.2. In the event that any Partner requests a meeting for the purpose of discussing or voting on the matter so noticed, notice of a meeting shall be given pursuant to Section 8.2 and no action shall be taken until the meeting is held. Unless delayed by a request for and the conduct of a meeting, any action taken without a meeting shall be effective fifteen (15) days after the required minimum number of voters have signed consents to action without a meeting; however, the action shall be effective immediately if the General Partner and Limited Partners representing at least ninety percent (90%) of the interests of the Limited Partners sign consents to action without a meeting.

8.7 <u>Proxies</u>.

A. Every Partner entitled to vote may authorize another person or persons to act by proxy with respect to that Partner's interest in the Partnership.

B. Any proxy purporting to have been executed in accordance with this Section shall be presumptively valid.

C. No proxy shall be valid after the expiration of eleven (11) months from the date thereof unless otherwise provided in the proxy. Subject to Subsections (f) and (g) of this Section, every proxy continues in full force and effect until revoked by the person executing it.

12



Doc ID: a5d314a60525923113c08e5a6bd912353c4d9347

The dates contained on the proxy forms presumptively determine the order of execution, regardless of the postmark dates on the envelopes in which they are mailed.

D.    A proxy is not revoked by the death or incapacitation of the person executing it, unless (except as provided in Subsection (f) of this Section), before the vote is counted, written notice of the death or incapacity of the maker is received by the Partnership.

E.    Revocation of a proxy is effective by a writing delivered to the Partnership stating that the proxy is revoked or by a subsequent proxy executed by the Partner who executed the proxy or, as to any meeting, by the attendance and exercise of the right to vote at that meeting by the Partner who executed the proxy.

F.    A proxy that states that it is irrevocable, is irrevocable for the period specified therein when it is held by any creditor or creditors of the Partnership or the Partner who extended or continued credit to the Partnership or the Partner in consideration of the proxy if the proxy states that it was given in consideration thereof and the name of the person extending or continuing credit. In addition, a proxy may be made irrevocable (notwithstanding Subsection (d) of this Section) if it is given to secure the performance of a duty or to protect a title, either legal or equitable, until the happening of events which, by its terms, discharge the obligations secured by it.

G.    Notwithstanding the period of irrevocability specified in the proxy as provided in Subsection (f) of this Section, a proxy will become revocable when the debt of the Partnership or Partner is paid.

H.    A proxy may be revoked, notwithstanding a provision making it irrevocable, by the assignment of the interest in the Partnership of the Partner who executed the proxy to an Assignee without knowledge of the existence of the proxy and the admission of that Assignee to the Partnership as a Partner.

I.    The General Partner may, in advance of any Partnership meeting, prescribe additional regulations concerning the manner of execution and filing of proxies and their valuation.

13



ARTICLE IX
ASSIGNMENT AND/OR TRANSFER OF PARTNERSHIP INTEREST

9.1     Conditions for Transfer.     A Partner may sell, assign, transfer, encumber, or otherwise dispose of an interest in the Partnership only in conformity with the provisions of this Article IX.

9.2     Prohibition Against Assignment, Sale, or Other Transfer.     Notwithstanding any other provision of this Agreement, during the nine (9) month period after execution hereof, no Partner or his heirs, personal representative, successors, or assigns, shall have the right to assign, sell or otherwise transfer, for consideration or gratuitously, all or any portion of his interest in this Partnership, except to a bona fide resident of the State of California.

9.3     Assignments.     Subject to the provisions of Section 9.2, a Partner may assign all or part of his interest in the profits and losses of the Partnership to any other person upon such terms and conditions as he may deem fit.  The Assignee shall not be admitted as a Substituted Partner without the approval of the General Partner or, if the General Partner is the Assigning Partner, without the approval of fifty-one percent (51%) of the Limited Partners.     Any assignment made to anyone, not admitted as a Substituted Partner, shall be effective only to give the Assignee the right to receive the share of profits to which the Assigning Partner would otherwise be entitled, shall not relieve the Assigning Partner from any liability under any agreement to make additional capital contributions, shall not relieve the Assigning Partner from liability under the provisions of this Agreement, and shall not give the Assignee the right to become a Substituted Partner. Neither the General Partner nor the Partnership shall be required to determine the tax consequences to any Assignee arising from the assignment of a Partnership interest.    The Partnership shall continue with the same basis and capital accounts for the Assignee as was attributable to the Assigning Partner.

9.4     Transfer on Death of a Partner.

A.     Subject to the provisions of Section 9.2, if any Partner dies, then his personal representative, heirs, devisees, or successors shall have an option, exercisable within sixty (60) days after the date of death to either:

1.     elect to become Substituted Partners; or

2.     offer to sell all but not less than all of the deceased Partner's interest to the remaining Partners.

14

B.     If the General Partner dies, his interest shall be converted to that of a Limited Partner pursuant to Subsection 12.3(b). The personal representative, heirs, devisees or successors of a deceased Partner may elect to become a Substituted Partner by sending written notification to that effect to the Partnership within sixty (60) days after death. If the personal representative, heirs, devisees or successors of the deceased Partner elect to sell all, but not less than all, of the deceased Partner's interest, they shall send a notice of this election to the remaining Partners within sixty (60) days after the date of death. If the personal representative, heirs, devisees or successors fail to elect to become a Substituted Limited Partner or to offer to sell all, but not less than all, of the interest of the deceased Partner, they shall be deemed to have automatically elected to become Substituted Partners.

C.     If the personal representative, heirs, devisees or successors of the deceased Partner offer to sell all, but not less than all, of the interest of the deceased Partner, the Project shall be valued pursuant to Subsection 9.4(h) hereof. After the interest is so valued, the remaining Partners shall collectively have the right to purchase all, but not less than all, of the deceased Partner's interest for the Adjusted Net Fair Market Value thereof in accordance with Subsection 9.4(d).

D.     Subject to the provisions of Subsection (b), the remaining Partners shall have an option to purchase their proportionate shares of all, but not less than all, of the deceased Partner's interest on the terms and conditions hereafter provided, exercisable by them at any time within fifteen (15) days after the date the Adjusted Net Fair Market Value of the deceased Partner's partnership interest is determined. If the remaining Partners fail to collectively elect to buy all, but not less than all, of the interest of the deceased Partner, then the deceased Partner's personal representative, heirs, devisees or successors shall automatically become Substituted Partners and shall have the right to assign or sell their partnership interests as provided herein.

E.     On exercise of an option to purchase the interest of a deceased Partner, the remaining Partners who are under an obligation to purchase, shall pay to the person or persons legally entitled thereto the purchase price for such interest in the following manner:

1.     Twenty-five percent (25%) within ten (10) days after a value is placed upon the Partner's interest, whether by agreement or appraisal, and the balance in forty-eight (48) equal monthly installments commencing on the first day of January in the year succeeding the year in which the option was exercised. If the Project is sold, the purchase price

15



Doc ID: a5d314a60525923113c08e5a6bd912353c4d9347

shall be paid in full at that time. After exercise of the option, interest only at the rate of ten percent (10%) per annum shall be paid monthly until principal and interest payments commence on the succeeding first day of January. The note evidencing the obligation to pay shall be unsecured.

   F. The phrase "Net Fair Market Value" of a Partner's interest shall, for purposes of this Agreement, be defined as the product determined by multiplying that Partner's percentage interest in profits and losses by the sum of the following:

   1. All cash and prepaid items on hand as of the date the option was exercised;

   2. An amount equal to the amount which would have received had the Project been sold for its fair market value at the time of the completion, reduced by closing costs in the amount of six and one-half percent (6-1/2%) of the total sale price and further reduced by all Partnership liabilities in existence at the time of the proposed sale.

   G. The Adjusted Net Fair Market Value of a Partner's interest shall be equal to the Net Fair Market Value of that Partner's interest reduced by an amount equal to twenty-five percent (25%) of the Net Fair Market Value of that Partnership interest.

   H. The fair market value of the Project shall be determined by unanimous agreement of buying and selling Partners, or if they do not agree within ten (10) days, then the fair market value of the Project shall be determined by three (3) appraisers. One appraiser shall be appointed by the buying Partners, one appraiser to be appointed by the selling Partner, or his successor, and the third to be appointed by the two so appointed. If the appraisers do not agree upon a single value, then the average value of the three appraisals shall be the fair market value of the Project. If the Partners cannot select three (3) appraisers then the determination of fair market value of the Project shall be submitted to binding arbitration in accordance with the procedure set forth in accordance with the procedure set forth in CCP §1280 et seq. All appraisers shall be appointed within ten (10) days after the election to offer to sell. All appraisals shall be completed with forty-five (45) days after the appraisers are appointed. All costs of appraisal and all costs of effecting the sale (except legal and accounting costs) shall be paid fifty percent (50%) by the buying Partner and fifty percent (50%) by the selling Partner.

16



9.5    Prohibition Against Other Transfer.    Except as provided in Section 9.3 and Section 9.4 above, no Partner, or his heirs, personal representatives, successors, or assigns, shall have the right, at any time, to sell or transfer, for consideration or gratuitously, all or any portion of his interest in this Partnership unless the following procedure is followed:

A.    Subject to the nine (9) month prohibition against transfer outlined in Section 9.2, such Partner shall deliver a notice in writing to the remaining Partners, stating the price, terms, and conditions of such proposed sale or transfer, and the identity of the proposed transferee. For a period of thirty (30) days after receipt of such notice, the remaining Partners shall have the first right to purchase all, but not less than all, of such interest so offered on the terms and conditions set forth in said notice or if there is no proposed transferee then for the price and on such terms and conditions as may be negotiated by the selling and buying parties.

B.    If there is more than one remaining Partner electing to purchase, each such Partner shall be entitled to purchase a proportionate share of the selling Partner's interest. If one or more Partners decline to purchase their proportionate share of such Partner's interest so offered, the proportionate share of each Partner who elects to purchase shall be increased pro rata.

C.    Should the remaining Partners fail to purchase all of such Partner's interest specified in the notice provided for in this Section, then after the expiration of thirty (30) days after receipt by them of such notice, or as soon as the Partners decide not to exercise their first right of refusal, the transferor Partner may transfer his interest to anyone without regard to any restrictions on transfer contained herein on the same terms and conditions and for the same price as set forth in the notice or if there is no proposed transferee, on the terms and conditions and for the price approved by the remaining Partners and upon no more favorable terms and conditions and for no less a price; provided, however, that if said interest is not transferred within one hundred (100) days after notification, then the transfer of such interest shall again become subject to the provisions of this Section.

D.    In the case of any Partner which is a corporation or Partnership, the transfer of fifty percent (50%) or more of the ownership of such corporation or partnership shall, for purposes of this Agreement, be deemed a transfer of the partnership interest owned by such Partner.

17



## ARTICLE X
## LIABILITIES OF PARTNERS

10.1     Liability of General Partner.  Except as otherwise provided in this Agreement, the liability of the General Partner arising from the conduct of the business affairs or operations of the Partnership or from the debts of the Partnership is unrestricted.

10.2     Indemnity by Limited Partners.   The Limited Partners hereby agree to save, defend and hold the General Partner harmless from any and all liability to the Partnership in excess of the General Partner's proportionate share thereof determined by reference to the General Partner's proportionate ownership interest in the Partnership.  Each Limited Partner shall be liable pursuant to this indemnity provision only to the extent of such Limited Partner's proportionate ownership interest in the Partnership.  The purpose of this Agreement is to ensure that the Limited Partners and the General Partner participate equally in losses as well as profits derived from the Partnership.  This Agreement is not intended to create third party beneficiary rights in any creditor of the Partnership.  Each Limited Partner shall honor this indemnity agreement within ten (10) days after notice and demand by the General Partner and hereby waives any defense that an action may not be maintained against a Partner until a final accounting and dissolution.

## ARTICLE XI
## PROHIBITED TRANSACTIONS

11.1     Specified Acts.   During the time of the organization or continuance of this Limited Partnership, neither the General nor the Limited Partners hereof shall do, and the Partners specifically promise not to do any of the following:

A.     Use the name of the Partnership (or any substantially similar name) or any trademark or trade name adopted by the Partnership, except in the ordinary course of the Partnership business.

B.     Disclose to any non-partner any of the Partnership business practices, trade secrets, or any other information not generally known to the business community.

18

X-Z  SC

C.    Do any other act or deed with the intention of harming the business operations of the Partnership.

D.    Do any act contrary to this Agreement, except with the prior express written approval of all Partners.

E.    Do any act that would make it impossible to carry on the intended or ordinary business of the Partnership.

F.    Confess a judgment against the Partnership.

G.    Abandon or transfer or dispose of Partnership property, real or personal.

11.2    Use of Partnership Assets.    The General Partner shall not use, and hereby specifically promises not to use, directly or indirectly, the assets of this Partnership for any purpose other than conducting the business of the Partnership, for the full and exclusive benefit of all its Partners.

<div align="center">

ARTICLE XII
DISSOLUTION OF THE PARTNERSHIP

</div>

12.1    Dissolution and Winding Up.    The Partnership shall be dissolved, and its affairs shall be wound up upon expiration of the term provided for the existence of the Partnership; or when all of the assets of the Partnership have been sold or distributed by the Partnership; or pursuant to Section 12.2.

12.2    Dissolution Upon Consent.    The Partnership shall be dissolved upon any date specified in a consent to dissolution signed by the General Partner and by sixty-seven percent (67%) of the Partners.

12.3    Dissolution When General Partner Ceases as Such.

A.    Except as provided in Section 12.3(c), the Partnership shall not dissolve upon the death, incompetency or withdrawal of the General Partner or any Limited Partner. All Partners specifically agree that the Partnership shall not be dissolved for any reason other than as set forth in Sections 12.1, 12.2 or 12.3(c).

B.    Upon the death, incompetency or withdrawal of the General Partner, the General Partner's interest shall become that of a Limited Partner with all the rights, duties and obligations of a Limited Partner hereunder. The transferee of the General Partner in the event of death or incompetency shall be admitted as a Substituted Limited Partner.

<div align="center">19</div>



C.     In the event of death, incompetency or withdrawal of the General Partner, the Limited Partners shall elect a new General Partner by a fifty-one percent (51%) vote. Each Partner's interest shall be reduced proportionately to the extent of the new General Partner interest. If a new General Partner is not selected within ninety (90) days after the date of death, incompetency or withdrawal, then the Partnership shall be wound up and dissolved.

12.4    Responsibility for Winding Up. Upon dissolution of the Partnership, the affairs of the Partnership shall be wound up by the General Partner, or if there is no General Partner, the Partnership's affairs shall be wound up by the Limited Partners.

12.5    Liquidation and Distribution. The person or persons responsible for winding up the affairs of the Partnership shall take full account of the Partnership assets and liabilities, shall liquidate the assets of the Partnership as promptly as is consistent with obtaining the fair value thereof, and shall apply and distribute the proceeds in the following order:

A.     To creditors of the Partnership, including Partners who are creditors to the extent provided by law;

B.     Then to the Partners in proportion to their capital accounts.

C.     Any Partner with a deficit in his capital account following the distribution of liquidation proceeds is required to restore the amount of such deficit to the Partnership, which amount shall be distributed to the other Partners in proportion to their positive capital account balances or paid to creditors.

12.6    Filing Certificate of Dissolution. Upon dissolution of the Partnership, the General Partner shall execute and file in the office of the Secretary of State of the State of California a Certificate of Dissolution. If dissolution occurs after a sole General Partner ceases to be a General Partner, the Limited Partners conducting the winding up of the Partnership's affairs shall file the Certificate of Dissolution.

12.7    Cancellation of Certificate of Limited Partnership. Upon completion of the winding up of the Partnership's affairs, the Partners conducting the winding up of the Partnership's affairs shall execute and file in the office of the Secretary of State of the State of Wyoming a Certificate of Cancellation of the Certificate of Limited Partnership. If dissolution occurs after a sole General Partner ceases to be a General Partner, the Limited Partners conducting the winding up of the Partnership's affairs shall file the Certificate of Cancellation.

20

## ARTICLE XIII
## MISCELLANEOUS PROVISIONS

13.1     Entire Agreement.  This Agreement contains the entire understanding among the Partners and supersedes any prior written or oral agreements between them respecting the subject matter contained herein.     There are no representations, agreements, arrangements, or understandings, oral or written, between and among the Partners relating to the subject matter of this Agreement that are not fully expressed herein.

13.2     Amendments.  The provisions of this Agreement may be amended only by unanimous vote of the Partners.  Any amendment of this Agreement shall be in writing, dated, and executed by all Partners.  If any conflict arises between the provision of any amendment and the original Agreement as previously amended, the most recent provisions shall control.   No amendment shall, without the unanimous con sent of all Partners, modify the Partnership interests of the Partners or the allocation of profits or losses or distributions, change   the compensation provided for the General Partner or amend this  Section, except as provided in Subsections 2.3, 2.4 or 9.3.

13.3     Attorneys' Fees and Costs.  If any action at law or in equity, including an action for declaratory or injunctive relief, is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and costs.

13.4     Governing Law.  All questions with respect to the construction of this Agreement and the rights and liabilities of the parties hereto shall be governed by the laws of the State of California.

13.5     Notices.  All notices shall be in writing and sent by regular United States mails. All notices to the Partners shall be sent to them at the addresses shown for them in the records of the Partnership.  All notices to the Partnership shall be sent to it at its principal executive office. Notices shall be deemed to have been delivered when deposited in the United States mails.

13.6     Successors.  Subject to the restrictions against assignment of partnership interests contained herein, this Agreement shall inure to the benefit of and shall be binding upon the assigns, successors in interest, personal representatives, estates, heirs, and legatees of each of the parties hereto.

21

13.7    Severability.  If any provisions of this Agreement shall be declared by a court of competent jurisdiction to be invalid, void, or unenforceable, the remaining provisions shall continue in full force and effect.

13.8    No Execution by Spouses.  This Agreement is executed only by the Partners. Each Partner hereby certifies that he has the full right and authority to bind the marital property of such Partner and his spouse.

13.9    Election of Adjusted Basis.  In the event of a transfer of all or part of the interest of a Partner, the General Partner may elect, on behalf of the Partnership, to adjust the basis of the Partnership property pursuant to Section 754 of the Internal Revenue Code.  All other elections required or permitted to be made by the Partnership; under the Internal Revenue Code shall be made by the General Partner in such manner as will, in his opinion, be most advantageous to a majority in interest of the Limited Partners.

13.10    Counterparts.  This Agreement may be executed in several counterparts and all counterparts so executed shall constitute one agreement which shall be binding on all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart.

13.11    Headings.  The heading preceding the paragraphs of this Agreement are for convenience of reference only, are not a part of this Agreement, and shall be disregarded in the interpretation of any portion of this Agreement.

13.12    Other Instruments.  The parties hereto covenant and agree that they shall execute each other and further instruments and documents as are or may become necessary or convenient to effectuate and carry out the Partnership created by this Agreement.

Effective September 24, 2019,  at Charlotte, North Carolina.

[Signatures on the following pages]

X 2    SC

GENERAL PARTNER:
Dragon Capital Group LLC

*Shumei Chen*

By: _____
      Shumei Chen, its Member


LIMITED PARTNER:
Xuejun (Mark) Zhang

Signature: _____

[Remining part of this page is left blank intentionally]

22

# FXTRADE ZH LP

## DISCRETIONARY INVESTMENT MANAGEMENT AGREEMENT (NON-ERISA)

To:      Dragon Capital Group LLC
           ("General Partner")
           Attention: Mr. Alex Cheng

From:    Xuejun (Mark) Zhang
           10711 Kristens Mare Dr
           Charlotte, NC 28277
           (*"Limited Partner"*)

      The undersigned (referring to all account holders jointly and severally, as trustees, corporate officers, custodians and/or any other authorized person(s) signing as or for the *"Limited Partner"* or *"Limited Partners"* as designated on the signature page of this Agreement) hereby employs your services, according to the following terms and conditions:

## 1. Limited Partnership Objectives, Contribution and Pledge of Assets.

      The objective of the Limited Partnership is to effect further financing for Development Projects of the Partners at better than market terms. In order to assist in qualifying for financing; the Limited Partner hereby agrees to Pledge and Convey certain liquid and tangible assets in the following delineations as its Contribution to the Partnership:

      a.) Cash in the amount of: USD$700,000 (USD SEVEN HUNDREAD THOUSAND)

The General Partner hereby agrees to assume full liability for the financial and fiduciary oversight of the Contribution of the Limited Partner as provided for by the terms of this agreement.

      **2.**     **General Partner Discretionary Oversight Services on Investment Fund.** The Limited Partner hereby appoints General Partner, and General Partner hereby accepts the appointment, to be the Limited Partnership's investment General Partner and provide discretionary investment management services as to the investment account(s) established by the Limited Partner with General Partner (the *"Account"* whether one or more) in accordance with the terms and conditions hereinafter set forth. Throughout the term of this Agreement, General Partner shall have full discretion to supervise, manage, direct the distribution of any and all loan proceeds held in the Account, together with all additions, substitutions and alterations thereto, with full power and authority as agent and attorney-in-fact to purchase, sell, invest, reinvest, exchange, convert, and trade the loan proceeds in the Account, and perform any act incidental thereto, in any manner deemed appropriate and to place all orders for the purchase and sale of Account assets with or through brokers, dealers, or issuers selected by General Partner or as directed by the Limited Partner, as the case may be, all without prior consultation with the Limited Partner and all at such times as the General Partner deems appropriate (subject to any restrictions imposed by the Limited Partner in the Limited Partner Documentation, as defined in Section 2).

XZ SC

---

# FXTRADE ZH LP

3. **Applicable Investment Guidelines for Cash and Real Property Contribution of Limited Partner.** General Partner will manage and select investments for the Account in accordance with the investment policy substantially in the form attached hereto as Exhibit A and instructions, limitations and/or designations provided or established by the Limited Partner in writing and delivered to General Partner (the *"Limited Partner Documentation"*), which may be amended from time to time by the Limited Partner. The allowances extend to the utilization of the cash on accounts for the expressed purpose of demonstrating debt service capacity for any contemplated loans against the Real property. Additionally, the Real Property may not be encumbered except as a means of deriving further loan consideration. Limited Partner acknowledges and agrees that the Limited Partner is responsible for ensuring that the investment policy and other directives provided to General Partner are in accordance with applicable law. The Limited Partner represents that the Limited Partner Documentation, the information set forth in Exhibits B and C hereto, and any other written information provided to General Partner is accurate and complete, and the Limited Partner agrees that General Partner and its agents or designees may each rely on such information in performing their responsibilities hereunder. The Limited Partner acknowledges and understands that it shall be the responsibility of the Limited Partner to promptly advise General Partner of any changes in such Limited Partner Documentation or other written information provided by the Limited Partner to General Partner.

4. **Custody of Assets.** All transactions authorized by this Agreement shall be consummated by payment to or delivery by the Limited Partner or the Limited Partner's designated custodian of the Account (the *"Custodian"*) of all cash and/or securities due to or from the Account. Instructions of General Partner to the Limited Partner or the Custodian with respect to asset transactions shall be made in writing (which shall include without limitation any reliable electronic form of instruction) or orally and confirmed in writing as soon as practicable thereafter, and General Partner shall instruct all brokers, dealers, or issuers executing orders on behalf of the Account to forward to the Limited Partner or the Custodian copies of notices of all transactions promptly after execution. The Limited Partner acknowledges and understands that only the Limited Partner and the Custodian will have direct or indirect possession or custody with respect to the assets held in the Account. The General Partner agrees to provide to the Limited Partner all necessary custodial information and authorization for the purposes of security clearance, Account reporting and all other investment advisory purposes, including distributions from the Account as instructed by General Partner.

5. **Allocation of Brokerage.** Where General Partner places orders for the execution of portfolio transactions for the Account, General Partner will obtain the best execution for orders of the Account in accordance with applicable law. General Partner may also allocate such transactions to such brokers and dealers, including affiliates of General Partner, for execution on such markets, at such prices and at such commission rates as in the good faith judgment of General Partner will be in the best interest of the Account, taking into consideration in the selection of such brokers and dealers not only the available prices and rates of brokerage commissions, but also other relevant factors (such as, without limitation, execution capabilities, research and other services provided by such brokers or dealers which are expected to enhance the general portfolio management capabilities of General Partner, and the value of an ongoing relationship of General Partner) without having to demonstrate that such factors are of a direct benefit to the Account.

Doc ID: a5d314a605259231 13c08e5a6bd912353c4d9347

# FXTRADE ZH LP

6. **Limited Partner Representations and Acknowledgements.** The Limited Partner represents and/or acknowledges that: (a) this Agreement does not violate any obligations by which the Limited Partner is otherwise bound and upon execution and delivery, this Agreement will be binding upon the Limited Partner in accordance with its terms; (b) the Limited Partner has reviewed the Limited Partner Documentation (if any) with a representative of General Partner; (c) the Limited Partner has delivered to General Partner, and from time to time hereafter promptly will deliver to General Partner, in writing, all of the information which the General Partner may require or reasonably request in order to perform its duties hereunder without violating or causing any violation of its fiduciary duties hereunder, or any provision of any applicable law, and promptly will notify General Partner, in writing, of any material change in the information so furnished to it; and (d) the Limited Partner is independent of and unrelated to General Partner and its affiliates.

7. **General Partner Representations and Acknowledgements.** General Partner represents and/or acknowledges that: (a) General Partner is registered or exempt from registration as an investment adviser with the Securities and Exchange Commission under the Investment Advisers Act of 1940; and (b) to the extent required by law, General Partner will treat as confidential any information obtained from or about the Limited Partner or the Limited Partner's Account through the performance of its obligations under this Agreement.

8. **Non-exclusivity.** It is understood that General Partner may perform investment advisory services for various Limited Partners. The Limited Partner agrees that General Partner may give advice and take action in the performance of its duties with respect to any of its other Limited Partners which may differ with respect to the Account so long as it is the policy of General Partner, to the extent practical, to allocate investment opportunities to the Account over a period of time on a fair and equitable basis relative to other Limited Partners. Nothing in this Agreement shall be deemed to confer upon General Partner any obligation to acquire for the Account a position in any security which General Partner or its directors, principals or employees may acquire for their own accounts or for the account of any other Limited Partner, if in the sole and absolute discretion of General Partner it is not, for any reason, practical or desirable to acquire a position in such security for the Account.

9. **Limitation of Liability.** In providing services under this Agreement, the Limited Partner acknowledges that except for negligence, willful misconduct or violation of applicable law, neither General Partner, nor its principals, directors, officers, employees or agents shall be liable for any damages, losses, expenses, or costs (including without limitation any attorneys' fees) (collectively a "*Loss*") arising out of or in connection with any acts or omissions or for any errors of judgment or use of discretion in managing the Account or for any Loss incurred by reason of any acts or omissions of any broker, custodian or other third party providing services, directly or indirectly, to the Account. The Limited Partner agrees to hold harmless and indemnify General Partner and its principals, directors, officers, employees or agents against any Loss which General Partner may incur if and to the extent such Loss is caused by the Limited Partner's or its agent's or designee's (other than General Partner) own gross negligence or willful misconduct or by any material inaccuracy or breach by the Limited Partner of any of its representations or acknowledgements hereunder. The Limited Partner understands that federal and/or state securities

Doc ID: a5d314a60525923113c08e5a6bd912353c4d9347

# FXTRADE ZH LP

laws give rights to the Limited Partner that may not be waived by this Agreement. This Section 9 shall survive the termination of this Agreement.

10. **Compensation.** The payment and computation of compensation due General Partner for rendering its services under this Agreement (the "*Fee*") shall be in accordance with General Partner's regularly published fee schedule in effect at the time the services contemplated herein are rendered. In the event the Fees payable hereunder are governed by General Partner's regularly published fee schedule (the "*Fee Schedule*"), the Limited Partner hereby acknowledges receipt of such Fee Schedule at the time of, or prior to, entering into this Agreement. The Limited Partner understands and agrees that the Fee Schedule may be amended from time to time by General Partner. In the event the Fee Schedule is amended, General Partner shall provide the Limited Partner with at least thirty (30) days' written notice prior to such amended Fee Schedule becoming effective as to the Account. All or a portion of the Fees paid to General Partner under this Agreement may be paid to one or more third parties, as determined by the General Partner, for services rendered in connection with the Account.

General Partner shall deliver to the Limited Partner and the Custodian (by mail, electronic medium, or any other reliable means agreed upon with the Limited Partner) within 5 days after each calendar month an invoice (the "*Fee Notice*") for the Fees earned by General Partner during the immediately preceding month. The Fee amount set forth in the Fee Notice shall be due and payable by the Limited Partner upon receipt.

In computing the market value of any asset held in the Account for billing purposes, each security listed on any national securities exchange shall be valued at the last sale price on the valuation date; but listed securities not traded on such date and any unlisted security regularly traded in the over-the-counter market shall be valued at the latest available bid price reflected by quotations furnished to General Partner by such source as it may deem appropriate. Any other asset shall be valued in such manner as shall be determined in good faith by General Partner to reflect its fair market value

11. **Account Reporting.** The General Partner shall instruct the Custodian to provide Limited Partner with such periodic Account reports as Limited Partner may reasonably request from time to time. General Partner shall provide to the Limited Partner periodic performance and Fee Notices in connection with the Account. The Limited Partner recognizes that dividends, capital gains, transfers and sales of securities may create a taxable event unless the Account is a tax-qualified or tax-exempt account. The Limited Partner also acknowledges that General Partner does not offer legal or tax advice and it is the separate responsibility of the Limited Partner to retain legal and tax professionals to the extent deemed necessary.

12. **Termination, Assignment and Amendment.** The Limited Partner acknowledges and understands that, unless otherwise agreed, this Agreement may be terminated by either party to this Agreement at any time upon ninety (90) days' prior written notice to the other party. Fees paid in advance will be prorated to the date of termination specified in the notice of termination and any unearned portion thereof will be refunded to the Limited Partner. No assignment (as defined in the Investment Advisers Act of 1940, as amended) of this Agreement by General Partner

XZ SC

# FXTRADE ZH LP

shall be effective without the Limited Partner's consent. Unless otherwise provided herein, any amendment of this Agreement shall require the written consent of both parties.

13. **Governing Law.** The Limited Partner understands that unless preempted by federal law, this Agreement shall be governed by the laws of the U.S. State of Delaware without giving effect to any conflict of laws, principle, doctrine or statute.

14. **Notices.** The Limited Partner understands that unless subsequent written notice is given, any notice, report or other written communication provided to a party shall be mailed to such party's address as stated on the signature page of this Agreement (or any exhibit thereof), and that General Partner may forward to its agents a copy of any written communication sent by the Limited Partner in connection with this Agreement. All notices and other communications contemplated by this Agreement shall be deemed duly given if provided in accordance with this Section 14.

15. **Severability.** If any part of this Agreement is determined to be illegal, invalid, or unenforceable, then such part will be considered severed from this Agreement and the remainder of the Agreement will continue in full force and effect.

16. **Counterparts.** This Agreement may be signed and executed in counterparts, each of which, when so executed and delivered, shall be deemed to be an original and all of which, when taken together, shall constitute one and the same signatory page of the Agreement.

17. **Entire Agreement.** This Agreement (and its accompanying exhibits) represents the entire agreement between the parties and expressly supersedes any prior written or oral agreement.

18. **Arbitration.** All controversies concerning (a) any transaction, (b) the construction, performance or breach of this Agreement, or (c) any other related matter which may arise between General Partner and the Limited Partner or its agents, shall be determined by arbitration conducted pursuant to the Federal Arbitration Act and the laws of the State of Delaware, before the American Arbitration Association. The Limited Partner understands that this arbitration clause does not constitute a waiver of the right to seek a judicial forum where such waiver is void under federal securities laws.

As or on behalf of the Limited Partner, I understand that, unless otherwise provided:

1. Arbitration is final and binding on the parties;

2. The parties are waiving their rights to seek remedies in court, including their right to a jury trial;

3. Pre-arbitration discovery is generally more limited than and different from court proceedings;

XZ  SC

Doc ID: a5d314a60525923113c08e5a6bd912353c4d9347

# FXTRADE ZH LP

4. The arbitrators' award is not required to include factual findings or legal reasoning, and any party's right to appeal or seek modification of rulings by the arbitrators is strictly limited; and

5. The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities or advisory industry.

Notwithstanding this Section 18, General Partner reserves the right to pursue all legal and equitable remedies that may be available to it. This Section 18 shall survive the termination of this Agreement.

**AGREED TO AND EXECUTED this 25th day of   September  2019.**

**LIMITED PARTNER:**
**XUEJUN (MARK) ZHANG**


Signature: _____


Address to which notices will be sent:
10711 Kristens Mare Dr
Charlotte, NC 28277



**GENERAL PARTNER:**

**DRAGON CAPITAL GROUP LLC**


By: _____
Name:  Shumei Chen
Title:  *Member*

Address to which notices will be sent:
10612 Providence Rd, STE D-223
Charlotte, NC 28277

# FXTRADE ZH LP

<div align="right">**Exhibit A**</div>

## INVESTMENT POLICY

Monies or assets (i) in accounts over which General Partner retains trading authority, and/or (ii) deposited in a custodial account of General Partner shall be invested in capital-protected transactions including, but not limited to, the following:

- Marketable equity and debt securities of issuers investment grade rated by S&P or Moody's;

- U.S. government obligations;

- Credit obligations of obligors investment grade rated by S&P or Moody's;

- Arbitrage, block trades, long-shorts and stock loans;

- Hedged derivative transactions, including futures;

- Commodities and fiat and crypto currencies;

- Investments in investment companies or investment funds which engage in trades of securities, derivative and commodities that meet the terms, conditions and limitations set forth herein; and

- Any other investment requested by Limited Partner.

# FXTRADE ZH LP

**Name of Limited Partner:**  Xuejun(Mark)Zhang

## QUALIFICATION STATEMENT

(a)     Please indicate with an "X" the manner in which you qualify as an "accredited investor" pursuant to Regulation D promulgated under the Securities Act of 1933, as amended (the "Act"):

☒     (1)  a natural person whose individual net worth[1] (or joint net worth with such person's spouse) exceeds US$1,000,000; or

☐     (2)  a natural person who had an individual income[2] in excess of US$200,000 in each of the two most recent years and who reasonably expects to have an individual income in excess of US$200,000 in the current year or who had "joint income"[3] in excess of US$300,000 in each of the two most recent years and who reasonably expects to have joint income in excess of US$300,000 in the current year.

(b)     Please indicate whether you are a "qualified purchaser" as defined under the Investment Company Act of 1940, as amended.

☒ Yes          ☐ No

---

[1]     For purposes of this item, "net worth" means the excess of total assets at fair market value, including home and personal property, over total liabilities, including mortgage debt.

[2]     For purposes of this item, "individual income" means adjusted gross income as reported for federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (but not including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any interest income received which is tax-exempt under Section 103 of the Internal Revenue Code of 1986 (the "Code"), (ii) the amount of losses claimed as a limited partner in a limited partnership (as reported on Schedule E of Form 1040), (iii) any deduction claimed for depletion under Section 611 et seq. of the Code, and (iv) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Code prior to its repeal by the Tax Reform Act of 1986.

[3]     For purposes of this item, "joint income" means adjusted gross income as reported for federal income tax purposes, including any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any interest income received which is tax-exempt under Section 103 of the Code, (ii) the amount of losses claimed as a limited partner in a limited partnership (as reported on Schedule E of Form 1040), (iii) any deduction claimed for depletion under Section 611 et seq. of the Code, and (iv) any amount by which income from long-term capital gains has been reduced in arriving at adjusted gross income pursuant to the provisions of Section 1202 of the Code prior to its repeal by the Tax Reform Act of 1986.

---

**Property of Dragon Capital Group LLC.**                    **Do Not Distribute or Copy**

Doc ID: a5d314a60525923113c08e5a6bd912353c4d9347

# FXTRADE ZH LP

(c)     Please answer questions 1-3 below:

      (1)     Occupation of Limited Partner:     **Consultant**

      (2)     Name of employer:     **FODIS Consulting**

      (3)     Business address of Limited Partner:

          **10711 Kristens Mare Dr, Charlotte, NC 28277**

(d)     Please respond to the following question:

No part of the funds used by the undersigned to acquire the Preferred Units constitutes assets of any "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, or other "benefit plan investor" (as defined in U.S. Department of Labor Reg. Section 2510.3-101 *et seq,* as amended) or assets allocated to any insurance company separate account or general account in which any such employee benefit plan or benefit plan investor (or related trust) has any interest.

☒ **True**            ☐ **False**

The undersigned hereby represents and warrants that all of the answers, statements and information set forth in this Qualification Statement are true and correct on the date hereof. The undersigned hereby agrees to provide such additional information as requested by the General Partner.

**IN WITNESS WHEREOF**, the undersigned has executed this Qualification Statement on this 25th day of September, 2019.

Limited Partner Name:     **XUEJUN (MARK) ZHANG**
                            *(print or type)*

Signature:

# ▼ HELLOSIGN

| | |
|---|---|
| **TITLE** | LP Agreement and Management agreement |
| **FILE NAME** | LP Agreement FXTRADE ZH.pdf and 1 other |
| **DOCUMENT ID** | a5d314a60525923113c08e5a6bd912353c4d9347 |
| **STATUS** | ⊕ Completed |

## Document History

| | | |
|---|---|---|
| ⟳ **SENT** | **09 / 25 / 2019** 23:07:26 UTC | Sent for signature to Mark Zhang (markzhangxj@gmail.com), Shumei Chen (mchenv3@gmail.Com) and Alex Cheng (alex@acgroupus.com) from alison@acgroupus.com IP: 69.132.251.247 |
| ◎ **VIEWED** | **09 / 25 / 2019** 23:41:21 UTC | Viewed by Mark Zhang (markzhangxj@gmail.com) IP: 172.72.140.128 |
| ◎ **VIEWED** | **09 / 25 / 2019** 23:54:13 UTC | Viewed by Shumei Chen (mchenv3@gmail.com) IP: 45.56.152.148 |
| ⤴ **SIGNED** | **09 / 25 / 2019** 23:55:41 UTC | Signed by Shumei Chen (mchenv3@gmail.com) IP: 45.56.152.148 |
| ⤴ **SIGNED** | **09 / 25 / 2019** 23:58:02 UTC | Signed by Mark Zhang (markzhangxj@gmail.com) IP: 172.72.140.128 |
| ◎ **VIEWED** | **09 / 26 / 2019** 00:09:52 UTC | Viewed by Alex Cheng (alex@acgroupus.com) IP: 45.56.152.148 |

**Y HELLOSIGN**

| | |
|---|---|
| **TITLE** | LP Agreement and Management agreement |
| **FILE NAME** | LP Agreement FXTRADE ZH.pdf and 1 other |
| **DOCUMENT ID** | a5d314a60525923113c08e5a6bd912353c4d9347 |
| **STATUS** | ⊚ Completed |

## Document History

| | | |
|---|---|---|
| ⊬ **SIGNED** | **09 / 26 / 2019** <br> 00:13:42 UTC | Signed by Alex Cheng (alex@acgroupus.com) <br> IP: 69.132.251.247 |
| ⟲ **COMPLETED** | **09 / 26 / 2019** <br> 00:13:42 UTC | The document has been completed. |